IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **GERARD CLARK,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| v. ] | |
| ] | **2:14-cv-1659-KOB** |
| **SIEMENS MEDICAL SOLUTIONS** ] | |
| **USA Inc., d/b/a/ PetNet Solutions,** ] | |
| ] | |
| **Defendant.** ] | |
| ] | |

## **MEMORANDUM OPINION**

This matter comes before the court on "Defendant Siemens Medical Solutions USA Inc.'s Motion for Summary Judgment." (Doc. 26). The Plaintiff sued his former employer, Siemens Medical Solutions, under Title VII and 42 U.S.C. 1981. (Doc. 4). The Plaintiff alleges that Siemens discriminated against him by (1) denying him training because of his race; (2) placing him on a Performance Improvement Plan because of his race and/or because he had complained of what he reasonably believed to be unlawful racial discrimination in employment; and (3) terminating his employment because of his race and/or because he had complained of what he reasonably believed to be unlawful racial discrimination in employment. (Doc. 4 at 6-9).

For the reasons discussed below, the court will **GRANT** the Defendant's motion for summary judgment as to all of Plaintiff's claims.

## **I. STANDARD OF REVIEW**

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed.

R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In response, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial.*'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added).

The court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254. The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *Id.* at 255. Furthermore, all evidence and

2

inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274,1282 (11th Cir. 1999).

After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

## II. FACTS

Gerard Clark, a black male, worked for Siemens Medical Solutions USA Inc. as a production technician from October 8, 2012 until Siemens terminated his employment on April 12, 2013. Siemens is a pharmacy that produces radioactive pharmaceutical drugs, which are used to diagnose diseased tissues. Siemens maintained a policy prohibiting race discrimination and retaliation throughout Clark's employment.

At the time Clark was hired on October 8, 2012, the pharmacy staff included the two production technicians, one cyclotron engineer, and one pharmacy manager. Clark, a production assistant, was responsible for general laboratory functions, quality control, production assistance, documentation and product packaging. Brian Brooks, a Caucasian, also worked as a production technician at the pharmacy during Clark's employment. Mark Novack served as the pharmacy manager, and Mike Mosley served as the Regional Operations Director. Siemens hired John Simpson, a Caucasian, as a pharmacist on November 15, 2012.

Pharmacy Manager Novack left his employment with Siemens on December 31, 2012. Following Novack's departure, Mike Mosley served as the interim pharmacy manager until Lee Hagan became the new pharmacy manager on January 14, 2013.

**Training**

Siemens provides its employees access to web-based training following their hire and subsequently provided instructor-led training. One of the web-based training programs is called "Learn@Siemens." Senior Manager of Technical Training Cinda Cippele, who works in the training and documentation department for the PETNET group at Siemens, provides training support for the PETNET group at Siemens. Pharmacy manager Novack provided Cippele with notice of Clark's hiring in October of 2012. However, because of an inadvertent oversight, Cippele did not initially provide Clark with access to the Learn@Siemens system. (Doc. 30 at 7; doc. 28-4 at 2).

Clark informed Jennifer Black, a regional physicist, and Christie Elam, a trainer, that he did not have access to Learn@Siemens and had not attended OPS training during a meeting in mid December. Clark informed Mosley that he did not yet have access to the Siemens network in mid to late January of 2013. Mosley assured Clark that he would fix the problem. However, Clark still did not have access to the Learn@Siemens program when Hagen became the pharmacy manager in Birmingham on January 14, 2013. Hagen learned that Clark has not completed the Learn@Siemens program around February 14, 2013.

Clark had completed the Learn@Siemens training courses that were applicable to newly hired production technicians by February 21, 2013. After completing the Learn@Siemens training, Clark attended "OPS I" training in Knoxville, Tennessee on March 5-8, 2013. Although Clark had previously been scheduled to attend OPS I training in January of 2013, his training was rescheduled to allow pharmacist Simpson to attend training during the January session. Simpson's training took priority over Clark's training because only a limited number of

employees can attend each session, and Simpson needed to be named on the pharmacy's Radioactive Materials license.

Access to the Learn@Siemens web-based training is the only training that Clark claims was delayed because of his race. Clark believes that delay in access to the Learn@Siemens training was based on his race because his white co-workers had access to the training materials, while he did not. He also believes that Brooks and Simpson made comments that contained racial undertones. Brooks once said that Clark was "a black man doing a white man's job," and John Simpson laughed. Brooks and Simpson also made comments regarding the 2012 presidential election, and Brooks made a comment that Clark's "people" were not getting themselves educated and also said "look at you, you did what you needed to do. You've done a lot of good things in your life. Why don't your people do more than that instead of asking for concessions?" Lee Hagen was present in the break room when Brooks and Simpson were talking about the presidential race.

Neither Brooks nor Simpson had any involvement in Clark's access to the Learn@Siemens training.

Clark told Novack and the Director of Human Resources Veronica Smith that he believed his delay in training was because of his race, but Clark never told Hagen or Mosley that he believed his race was the reason his training was delayed. Further, Hagen and Mosley were not aware of Clark's conversation with Novack and Smith.

**Plaintiff's Performance**

Before leaving the employment of Siemens on December 31, 2012, Mark Novack expressed concerns to Michael Mosley about Clark's performance since the beginning of his

5

employment at Siemens. (Doc. 28-3 at 1). While Mosley was working as the interim pharmacy manager, he was also concerned about Clark's work performance. Mosley was concerned that Clark did not understand the production schedules. Although Mosley's term as interim pharmacy manager did not begin until after December 31, 2012, Mosley was concerned that Clark had not appeared for work on the evening of a day on which the pharmacy had been closed for Christmas. Mosley was also concerned that Clark had been in a restricted area without proper supervision. Although Clark disputes he was in a restricted area, he admits that Mosley believed he was in a restricted area without supervision. Similarly, although Clark took paid time off for his missed shift in December, Mosley believed that Clark had improperly missed scheduled work. (Doc. 28-1 at 20).

On January 8, 2013, Mosley sent Clark an email addressing his concerns regarding Clark's performance. Then, shortly after Hagen took over the position as pharmacy manager on January 13, 2013, he became concerned about Clark's work performance. Hagen believed that Clark failed to correctly perform basic aspects of his job and repeatedly failed to perform explicit directions. Hagen met with Clark on February 7, 2013 to provide him with a Performance Improvement Notice ("PIP").[1] The PIP noted that Clark failed to follow proper procedures and failed to successfully complete several required qualifications. It noted that Clark failed to successfully complete qualifications for Final Product Vial Setup, Filtration, Dilution, and Sampling of FDG and Sodium Flouride, Final Product Vial Assembly, and inventory cycle count, which Clark was required perform on a regular basis as a production technician. The PIP also

---

[1] The Plaintiff and Defendant both refer to the Performance Improvement Notice as a "PIP" or "Performance Improvement Plan." For purposes of this opinion, the court will refer to the notice as a "PIP."

noted that Clark failed to follow explicit instructions, including failing to properly dispose of needles and syringes in designated containers as required by federal law, state law, and company policy; disregarding instructions to make needed chemicals for production on several occasions; and causing an unnecessary exposure to radiation that resulted in a stop-work order. Hagen stated in the PIP that further performance problems would lead to further discipline, including possible termination.

      Clark replied to the PIP on February 7, 2013 and admitted that he made some "very concerning mistakes and after hearing about them in a formal setting, a few of those mistakes concerned him too." (Doc. 28-1 at 99). In his response, Clark also noted he did not have an opportunity to receive the training that most new employees would receive and that he had only one opportunity to sit down and talk with Hagan. Although Clark admitted making "very concerning mistakes" in his response to the PIP, he does not believe he actually made any mistakes. Instead, he wanted to be transparent with his boss; he wanted to "have accountability and a good attitude." (Doc. 28-1 at 22).

      Clark's PIP did not result in any reduction in pay or demotion. Additionally, Clark does not believe that Hagen issued the PIP because of Clark's race; he does not know why Hagen issued the PIP. Hagen says that he issued the PIP because he believed Clark had a number of performance issues – issues that Clark believes resulted from his failure to receive Learn@Siemens training or OPS I training. However, Hagen continued to find that Clark's work was substandard even after Clark completed the Learn@Siemens web-based training in February of 2013 and OPS I training in March of 2013.

      On April 8, 2013, Hagen learned that Clark had scanned a wrong serial number into

batch records for sodium fluoride on March 20, 2013.  Clark scanned a serial number for a bottle of nitrogen that was not in use rather than scanning the correct serial number for the bottle actually used to produce the sodium fluoride in the batch for which he was generating records; Clark mistakenly scanned a "cheat sheet" made by Clark's co-worker Brooks. The "cheat sheet" included the serial numbers for all tanks, including a reserve tank of nitrogen that Clark mistakenly scanned.

The FDA requires Siemens to accurately document each step of the manufacturing process.  All controlled materials in the manufacturing process, like nitrogen, have specific serial numbers, which are used to track their use in production.  Each bottle of nitrogen has a unique serial number, and this number must be scanned into the batch records.

The serial number that Clark entered into the batch records was for a tank of nitrogen that had never been used and was located in a storage room.  Hagen believed that Clark intentionally scanned the incorrect bottle of nitrogen, which constitutes falsification of records.  Siemens considers falsification of records to be an "extremely serious violation," which may result in immediate termination.  (Doc. 28-1 at 89-90). Hagen and Clark met on April 8, 2013 to discuss Clark's scanning of the incorrect serial number.  Then Hagen decided to terminate Clark's employment after communicating with Mosley and human resources personnel.  Hagen terminated Clark because of his ongoing performance issues and his belief that Clark knowingly falsified batch records.

Clark proffers Bryan Brooks as a comparator in this case.  Clark notes that Bryan Brooks made mistakes in the quality control process, and Hagen would allow Brooks an opportunity to correct his mistakes. Bryan Brooks made more mistakes during the quality control process than

Clark. When either Brooks or Clark made mistakes, the mistakes were logged in Siemens' "Agile" system. Although Hagen terminated Clark because he believed Clark falsified batch records, Clark knows of no other employee that has falsified company records and was not terminated. Hagen terminated a Caucasian employee for falsifying company records on April 30, 2014.

**III. Analysis**

Plaintiff alleges that Siemens discriminated against him on the basis of his race in violation of Title VII and 28 U.S.C. § 1981 by denying him training, placing him on a Performance Improvement Plan, and terminating his employment. (Doc. 4 at 6-9). Title VII and § 1981 "have the same requirements of proof and use the same analytical framework, therefore [the court] shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

One way to establish a claim of racial discrimination is through direct evidence. *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997). If the plaintiff cannot prove discrimination by direct evidence, as in this case, the plaintiff must establish his prima facie case through the burden shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Nevertheless, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated . . . remains with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 251-52 (1981).

Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." 411 U.S. at 802. "To

establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) [he] is a member of a protected class; (2) [he] was subjected to an adverse employment action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorably than [he] was treated; and (4) [he] was qualified to do the job." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citing *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)).

"[T]o prove adverse employment action in a case under Title VII . . . an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Butler v. Ala. Dept. of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008) (internal citations, quotation marks, and emphasis omitted). The United States Supreme Court has found that changes in employment status "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" constitute adverse employment actions. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

"To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Hollifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "Indeed, '[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.'" *Embry v. Callahan Eye Found. Hosp.*, 147 Fed. Appx. 819, 829 (11th Cir. 2005) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)). Once the plaintiff establishes his prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411

10

U.S. at 802.

Once the employer shows a legitimate, nondiscriminatory reason for its decision, the employee must "be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804. To survive summary judgment, the employee must show "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004).

"Requiring an employee to perform [his] job is not a change in the terms, conditions, or privileges of [his] employment." *Butler*, 536 F.3d at 1215. As the Eleventh Circuit has stated,

> a Title VII discrimination claim 'rarely may be predicated merely on employer's allegedly unfounded criticism of an employee's job performance, where that criticism has no tangible impact on the terms, conditions, or privileges of employment. An employee who receives criticism or a negative evaluation may lose self-esteem and conceivably may suffer a loss of prestige in the eyes of others who come to be aware of the evaluation. But the protections of Title VII simply do not extend to everything that makes an employee unhappy.'

*Butler*, 536 F.3d at 1216 (quoting *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001)).

As the Eleventh Circuit has noted, federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

**A. Discrimination Claims**

    **1. Delay in training**

Siemens argues that Clark cannot prove the prima facie case for his claim that Siemens

discriminated against him on basis of race by delaying him access to the Learn@Siemens web-based training because the delay in receiving the Learn@Siemens training was not an adverse employment action. Further, Siemens asserts that the delay in providing Clark training was caused by an inadvertent error, and Clark offers no evidence to rebut the non-discriminatory reason as pretext.

As noted "to prove adverse employment action in a case under Title VII . . . an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Butler v. Ala. Dept. of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008). "An adverse employment action based on a denial of training is actionable only if the Plaintiff can establish that the employer denied material training opportunities to him." *Johnson v. Gestamp Ala., LLC.*, 946 F. Supp. 2d 1180, 1202 (N.D. Ala. 2013) (citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 n. 16 (11th Cir. 1998)).

In the present case, Clark argues that he was not provided the training materials that all new employees typically receive within 30 days of employment. However, Clark does not allege that the delay in training resulted in a change of compensation, duties, or benefits of employment. Instead, Clark appears to argue, without citation to any evidence in the record, that he later faced unsatisfactory performance evaluations related to tasks upon which he did not receive proper training. However, a more serious complaint about his work occurred when he scanned an incorrect serial number on March 20, 2016, after he had already received both Learn@Siemens and OPS I training. Although additional training at the start of his employment might have been helpful, the court is unable to conclude that the four-month delay in receiving Learn@Siemens training establishes "a serious and material change in the terms, conditions, or privileges of

12

employment." Accordingly, the court finds that Clark failed to establish that he suffered an adverse employment action.

Although the court finds that the delay in receiving training is not an adverse employment action, out of an abundance of caution, the court also notes that Clark fails to rebut Siemen's legitimate non-discriminatory reason for the delay in training as pretext. An unintentional oversight may serve as a nondiscriminatory reason for an employer's actions. *See Smith v. Boyd Bros. Transp., Inc.* 406 F. Supp. 2d 1238, 1245 (M.D. Ala. 2005) (noting that defendant's proffered reason, that it "simply made a mistake, meets [the] 'exceedingly light' requirement" to produce a legitimate nondiscriminatory reason).

Here, Clark notes that Novack provided notice to Cippele of Clark's hire, and Clark agrees that "due to an inadvertent oversight, Cippele didn't initially provide Clark with access to the Learn@Siemens system." (Doc. 30 at 7). Clark seems to agree that Cippele's mistake was the reason for the delay in training. After Hagen learned that Clark had not received training, Clark had Learn@Siemens training within the following week and attended OPS I training in Knoxville, Tennessee on March 5-8, 2013.

Clark argues that "there is no evidence that supports the reason for the delay in providing Clark access to training was not a pretext for race discrimination." (Doc. 30 at 28). Importantly, because Siemens stated a legitimate non-discriminatory reason for the delay in training, Clark bears the burden of establishing that the delay was pretext. In other words, Clark must show "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper*, 390 F.3d at 725. Clark merely points to the fact that he

13

told Novack, Black, Elam, Mosely, and Hagan that he had not yet received training. Although, Clark told a number of his co-workers, they were not involved in providing Clark training. The uncontradicted fact is that Novack provided Cippele notice of Clark's hire, and Cippele, who provides training support for Clark's group, made a mistake in failing to promptly schedule Clark's training. Further, Cippele did not know Clark's race at the time of the mistake.

Clark points to a conversation between Brooks and Simpson that contained racial undertones in an effort to establish pretext. Hagen was present in the room during that conversation; however, Brooks and Simpson were not involved in arranging Clark's training. Additionally, Hagen arranged for Clark to receive training within one week of learning that he had not received "Learn@Siemens" training. Simply put, Clark's proffered evidence fails to establish that Siemens' non-discriminatory reason for the delay in training was pretext for race discrimination, particularly when he recognized the delay was caused by Cippele's initial inadvertent oversight.

### 2. Performance Improvement Plan (PIP)

Plaintiff also alleges that Siemens discriminated against him on the basis of race by placing him on a Performance Improvement Plan. Hagen issued Clark a PIP because Hagen perceived that Clark's work performance was unacceptable. The PIP notice highlighted perceived inadequacies of Clark's work performance, outlined corrective steps to improve his performance, and informed Clark that additional discipline would result if Clark did not improve his performance within 30 days. Siemens argues that Clark's prima facie claim for discrimination regarding the PIP fails because Clark was not subjected to adverse employment actions when Hagen issued the PIP. The only argument that Clark makes that the PIP constituted an adverse

employment action is that Siemens references the PIP "throughout all court documents as a way to depict Clark's performance to be unsatisfactory which resulted in a negative impact." (Doc. 30 at 19).

"Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001). Because Congress "has expressly limited the types of employer actions which may give rise to a Title VII discrimination claim, such a claim rarely may be predicated merely on [an] employer's unfounded criticism of an employee's job performance, where that criticism has no tangible impact on the terms, conditions, or privileges of employment." *Id.* As explained by the Eleventh Circuit, "[e]xpanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques or *assertedly unjustified negative evaluations* would threaten the flow of communication between employees and supervisors." *Id.* At best, the PIP simply provided a notice of deficiencies and warning that Clark would face additional discipline and possible termination, if his work performance did not improve.

Clark's only argument that the PIP resulted in a "negative impact" of any kind is that Siemens refers to the PIP in court documents in this case. However, Clark fails to make any showing how reference to the PIP *after* his termination had any impact on his employment at the relevant time, while he was employed by Siemens. The PIP and its warning did nothing to affect Clark's terms, conditions, or privileges of employment. *See Apodaca v. Sec. Dept. of Homeland Sec.*, 161 Fed. App'x 897, 900-01 (11th Cir. 2006) (finding that a plaintiff's claims that an unsatisfactory annual performance evaluation and additional performance evaluations containing unsatisfactory comments did not materially alter the terms and conditions of Plaintiff's

employment). Accordingly, the court finds that the issuance of the PIP was not an adverse employment action, and Clark fails to establish his prima facie case on this discrimination claim.

Although Siemens correctly argues that Clark could not establish his prima facie case, the court notes that Clark's claims also would fail because Siemens' proffered a legitimate nondiscriminatory reason for issuing the PIP, and Clark fails to rebut it as pretext. Siemens asserts Hagen's belief that Clark's work performance was unacceptable as a nondiscriminatory reasons for Hagen issuing the PIP. Clark fails to rebut Siemens proffered reason as pretext. Instead, Clark confirms that he does not believe that Hagen issued the PIP because of his race. (Doc. 28-1 at 36). In fact, Clark's own deposition testimony confirms that Hagen's proffered reason for issuing the PIP was not pretextual. Accordingly, summary judgment is due to be granted on both grounds asserted by Siemens.

### 3. Termination from Employment

Clark also claims that Siemens discriminated against him on the basis of race by placing terminating his employment. To prove a claim of discriminatory discharge under Title VII and § 1981, Clark must first establish a *prima facie* case that (1) he is a member of a protected class; (2) he was qualified for the job he held; (3) he suffered an adverse employment action, here that he was terminated; and (4) he was replaced by someone outside his protected class *or* that similarly situated employees outside his protected class received more favorable treatment. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002). In the present case, Clark fails to present evidence of any comparator who is "similarly situated in all relevant aspects" who received more favorable treatment. *See Hollifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Clark proposes Bryan Brooks as his comparator because "Brooks and others made errors in production assistance." (Doc. 30 at 32). Clark asserts that Hagen would give Brooks an opportunity to correct errors in batch records; however, Clark provides no evidence that Brooks is an appropriate comparator in all relevant ways. Clark provides no evidence that Hagen ever suspected Brooks of falsifying batch records, and Hagen testified he never suspected Brooks of falsifying documents. (Doc. 28-2 at 12). Clark points to no other employee who was not terminated after management suspected him of intentionally falsifying records. Instead, neither Clark, Hagen, nor Mosley knew of any employee who falsified company records but was not terminated. (Doc. 28-1 at 43; doc. 28-2 at 11; doc. 28-3 at 4). Simply put, Clark fails to identify anyone from outside his protected class that received more favorable treatment than he or to identify anyone outside his protected class that replaced him.  Accordingly, Clark fails to establish his prima facie case regarding his termination claim.

**B. Retaliation Claims**

Clark also asserts that Siemens retaliated against him in violation of Title VII and 42 U.S.C. § 1981 by placing him on the PIP and terminating his employment after he complained about what he perceived as racial discrimination.

The also court analyzes claims of retaliation for engaging in a protected activity under the *McDonnell Douglas* burden-shifting framework. *See Bernard v. SSA Security, Inc.*, 299 Fed. App'x 927, 929 (11th Cir. 2008) (citing *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997)); *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564 (11th Cir. 1993).  Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case" of retaliation. 411 U.S. at 802. In the present case, Clark's

retaliation claims related to the PIP fail because the issuance of the PIP was not an adverse employment action, and Clark fails to prove any causal connection between his alleged protected activity and the issuance of the PIP.   Similarly, Clark's retaliation claim related to his termination also fails because Clark did not establish a causal connection between his complaint of racial discrimination and his termination.

To establish a prima face case of retaliation under Title VII, "a plaintiff must show that (1) [h]e engaged in statutorily protected expression; (2) [h]e suffered an adverse employment action; and (3) there is a causal connection between the two events." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (internal quotation marks omitted). To constitute "statutorily protected expression," a plaintiff need not establish an underlying discrimination claim; instead, the plaintiff must show only that he had a "good faith, reasonable belief" that he was the victim of an unlawful employment practice. *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001).

As noted above, Hagen's issuance of the PIP did not constitute an adverse employment action because Clark makes no showing that the PIP had any material affect on his employment. Accordingly, like his discrimination claim, Clark's retaliation claim related to the issuance of the PIP also fails. Additionally, even if the PIP adversely affected his employment, Clark's claim also fails because he cannot prove a causal connection between Hagan's issuance of the PIP and any statutory protected expression. "In order to establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that 'the protected activity and adverse action were not wholly unrelated.'" *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citing *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571 (11th Cir. 1993)). "At

a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Goldsmith*, 996 F.2d at 1163. Clark never told Hagen or Mosley that he believed the delay in training was because of his race. Absent knowledge by the decision maker of his claims that he was denied training based on his race, Clark's retaliation claim fails to demonstrate a causal link. Accordingly, the court turns to Clark's retaliation claim related to his termination from employment.

Siemens does not dispute that Clark engaged in statutory protected expression when Clark complained to Novack and Veronica Smith, a human resources representative, that he thought the delay in training was because of his race. However, Siemens correctly argues that Clark has shown no causal connection between Clark's complaints to Novack and Smith and *Hagen's* decision to terminate him.

Generally, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact about a causal connection," but to satisfy this showing, a plaintiff must establish "that the decision maker was *aware* of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (emphasis added). As an alternative to knowledge by the decision maker, a plaintiff may establish causation in a retaliation case where the decision maker followed a biased recommendation without independent investigation, such that the decision maker was "a mere conduit . . . to give effect to the recommender's discriminatory animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir.1999).

In this case, Clark never told Hagen or Mosley that he believed the delay in receiving

19

training was because of his race.  Neither Hagen nor Mosley knew about Clark's complaints to Novack and Smith. Simply put, the decision maker was not aware of Clark's complaints of racial discrimination. Additionally, Hagen was not blindly following a biased recommendation from anyone.  Even if the investigation did not satisfy Clark, Hagen conducted his own investigation regarding the incident on March 20, 2013 when Clark scanned the incorrect serial number for a tank of nitrogen.  After talking with Clark on April 8, 2013, Hagen concluded that he believed Clark falsified records, and discussed Clark's termination with human resources personnel. Because Clark has not made a showing that Hagen was aware of Clark's protected activity, the his prima facie case for retaliation regarding his termination fails.

## IV.  CONCLUSION

In summary, Clark fails to establish the prima facie case regarding his discrimination and retaliation claims.  Therefore, Clark's case cannot survive summary judgment.  For the reasons stated above, the court finds that Defendant's motion for summary judgment is due to be **GRANTED** as to all of Plaintiff's claims.

DONE and ORDERED this 31st day of March, 2016.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE